1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3
    UNITED STATES OF AMERICA,        )   No. 20 CR 257
4                                    )
              vs.                    )   Chicago, Illinois
5                                    )
    AMBER L. PELTZER,                )
6                                    )   July 9, 2020
                    Defendant.       )   3:34 p.m.
7

8              TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HON. JEFFREY T. GILBERT, MAGISTRATE JUDGE
9

10  APPEARANCES:

11  For the Government:    MR. ALBERT BERRY III
                           United States Attorney's Office,
12                         219 South Dearborn Street, Room 500,
                           Chicago, Illinois  60604
13

14  For the Defendant:     MR. MICHAEL B. NASH
                           Michael B. Nash, Attorney at Law,
15                         650 North Dearborn Street, Suite 700,
                           Chicago, Illinois  60654
16

17

18

19

20

21

22
                    PATRICK J. MULLEN
23                Official Court Reporter
               United States District Court
24          219 South Dearborn Street, Room 1412
                 Chicago, Illinois  60604
25                   (312) 435-5565

1      (Telephonic proceedings on the record.)

2      THE CLERK:  20 CR 257, United States of America versus

3  Amber Peltzer for a detention hearing.

4      THE COURT:  Okay.  Good afternoon.  Let's get

5  appearances of counsel, first the United States and --

6      MR. BERRY:  Good afternoon.

7      THE COURT:  -- then defendant and then pretrial

8  services.

9      MR. BERRY:  Good afternoon, Your Honor.  Albert Berry,

10  B-e-r-r-y, for the United States.

11      MR. NASH:  Michael Nash, N-a-s-h, for Amber Peltzer.

12      THE DEFENDANT:  Amber --

13      MR. SCHROEDER:  Sam Schroeder.

14      THE DEFENDANT:  Oh, sorry.

15      MR. SCHROEDER:  Sam Schroeder, pretrial services, Your

16  Honor.

17      THE COURT:  Okay.  Good afternoon, counsel.

18      Ms. Peltzer, you're on the line as well?

19      THE DEFENDANT:  Yes, sir.

20      THE COURT:  Okay.  Are you agreeing to participate in

21  this hearing by telephone as opposed to in person?  Because of

22  the COVID-19 pandemic, we're giving people that opportunity if

23  they agree to do so.

24      THE DEFENDANT:  Yes, Your Honor.

25      THE COURT:  Okay.  We're here for a detention hearing

1    in Ms. Peltzer's case.  Go ahead.

2         MR. NASH:  Can we find out where she's at?

3         THE COURT:  All right.  Where are you currently in

4    custody, Ms. Peltzer?

5         THE DEFENDANT:  Oh, I can't hear you.  What did you

6    say, sir?

7         THE COURT:  Where are you currently in custody?

8         THE DEFENDANT:  I'm in the MCC building on Van Buren.

9         THE COURT:  Okay.  Did everybody get the pretrial

10   services report from Mr. Schroeder?

11        MR. BERRY:  The Government has, Your Honor.

12        MR. NASH:  I did.

13        THE COURT:  Okay.  Mr. Berry, did you say you had it?

14        MR. BERRY:  I have it, Your Honor, yes, both the

15   original and the addendum.

16        THE COURT:  Okay.  I'm looking at the --

17        MR. SCHROEDER:  The original, Your Honor, was

18   submitted on June 30th.  The original was just a criminal

19   history.

20        THE COURT:  Got it.  Okay.  I have both of them.

21        All right.  What's the United States' position here?

22        MR. BERRY:  Your Honor, we are seeking detention in

23   this matter more for risk of flight but also for danger to the

24   community.  I'll just briefly go through some of the factors

25   that are outlined in section 3142(g) of the United States Code.

1      With regard to the nature and circumstances of the

2  offense, this offense happened in the early morning hours of

3  May 31st, 2020.  On May 30th, 2020, there was some protests

4  following the murder of George Floyd, and those protests took

5  place in Chicago.  They went into the night, and early into the

6  morning they kind of devolved into what we call civil unrest.

7  There was some problems that went down and some looting that

8  took place.

9      CPD was out there, and when they were in the area of

10  16th and Michigan they were driving an unmarked vehicle and saw

11  Ms. Peltzer kind of in the doorway of an area.  To them, they

12  believed that she was kind of hiding, peering out of the

13  doorway.  They made a U-turn and came back to investigate.

14      As they were walking back towards the area where they

15  saw her, a civilian from the second floor of the building was

16  on the terrace and told them that the person in the red car had

17  a firearm.  According to the officers, there was only one red

18  car on the block.  They looked towards that red car, and

19  Ms. Peltzer was in the driver's seat.  She was the only

20  occupant of the vehicle, and at that point she was reaching

21  towards the passenger's seat as the officers walked towards the

22  car.

23      Once they got there, one officer could see inside the

24  window of the car, and on the passenger's seat he sees a

25  firearm and a purse that belonged to Ms. Peltzer.  Ms. Peltzer

1    was arrested as being a felon in possession of a firearm at

2    that point.

3              Your Honor, that's the facts and circumstances of the

4    case.  I'm going to talk about the history of Ms. Peltzer.  She

5    does have a long criminal history.  She has felonies, a

6    robbery, an aggravated robbery with a firearm, felonies for

7    theft.  There's also, it looks like, some open cases that we

8    have.  There's an open case in Will County for ID theft.

9    There's an open case in Oak Brook for burglary.  The open case

10   in Will County, there's a complaint and there's actually a

11   warrant that's out for her arrest for that one.  She also has

12   an open case in St. John, Indiana for resisting.  That's a

13   felony in Indiana.

14             Ms. Peltzer has a criminal history out of Cook County

15   in Illinois and a criminal history out of Indiana for the

16   theft.  Well, it was actually a robbery that was pled down to a

17   theft.  She also has a criminal history out of Florida, and it

18   looks like she's on probation at the moment.  So she's

19   committed the offense while she was on probation in a different

20   jurisdiction.

21             Also, Your Honor, in looking at her criminal history

22   that was provided by pretrial, there are a number of bond

23   forfeitures out of state.  There's also warrants and violations

24   of probation.  With all of that said, Your Honor, it's the

25   Government's position that Ms. Peltzer is a risk of flight.

1          Also, as I said, there's active warrants for her.  So
2    with these crimes that she's been convicted of in such a short
3    period of time and the open cases that she has, if she's
4    released into the community (inaudible) a danger to the
5    community.  There's a danger of committing more crimes, you
6    know, possibly identification theft which is what (inaudible).

7          I'd also like to mention that the car that Ms. Peltzer
8    was found in, there's an investigation going on there.  The
9    license plate, the temporary plate that was on the back of the
10   car came back to another individual who informed ATF that he
11   actually had his car in his driveway and that he had recently
12   been the victim of identity theft.

13         So that's the Government's position at this time.

14         THE COURT:  Where do you think she's going to flee to?

15         MR. BERRY:  Well, Your Honor, it's not a -- well, what
16   I should say is it's a matter of where she will be and whether
17   she will appear in court.  So I don't know it actually says,
18   you know, a likelihood to flee, but it's actually more or less
19   in this case a likelihood to not appear in court.  In her
20   criminal history, her history shows that she does not appear in
21   court when she's directed to.

22         There's also a -- I understand that she says she's
23   been a resident of Chicago her whole life, the Chicagoland area
24   her whole life.  But with the crime history in Chicago, in
25   Illinois, Indiana, and Florida, it seems like there's some kind

1    of connection to Indiana at the very least, which is out of the

2    state, and also there's a connection in Florida which she has

3    technically violated her probation on.

4         THE COURT:  Well, just to be clear, under the statute

5    this is a firearm, a felon in possession of a firearm.  So

6    under 3142(f)(1)(e), I think, you know, there's at least a

7    detention hearing that you get.  So you're not -- you don't

8    have to prove up a serious risk of flight.  You have to prove

9    up risk of non-appearance, I think, under the statute.  But you

10   had used the term "serious risk of flight," so I was wondering

11   where --

12        MR. BERRY:  I apologize, Your Honor.  It is a risk of

13   non-appearance.  I used the wrong terminology.

14        THE COURT:  So what you're saying essentially is that

15   there's a lot of recent criminal history -- and, you know, for

16   "recent" I'm going back to 2018 -- in three states or at least,

17   you know, one conviction and arrests in essentially three

18   states and multiple jurisdictions.  So she is engaging in risky

19   conduct, and there's a risk that this conduct continues and

20   that she won't appear in these proceedings to defend the case,

21   is that right?  Is that what you're saying on risk of

22   non-appearance?

23        MR. BERRY:  Yes, as far as the risk of non-appearance,

24   and also with the fact that her history shows that she has bond

25   forfeiture warrants and violations of probation which show that

1   she does not listen to court orders or does not obey orders by

2   the court very well.

3            THE COURT:  And the danger to the community?

4            MR. BERRY:  The danger to the community part, Your

5   Honor, it's my understanding or my belief that when we talk

6   about danger to the community, people always believe we're

7   talking about violence.  In this case, though she does have the

8   robbery, I think the danger to the community comes more in the

9   form of theft.  That seems to be the history of this defendant.

10  She has a theft conviction, a misuse of credit card conviction.

11  She has a warrant out for burglary, and she also has a warrant

12  out for identification theft.

13           THE DEFENDANT:  No.

14           MR. BERRY:  Releasing her to the community puts people

15  in jeopardy financially in this case, it seems, more than

16  physically.

17           THE COURT:  But I think you said at the outset you're

18  mostly arguing risk of non-appearance, correct?

19           MR. BERRY:  That's correct, Your Honor.

20           THE COURT:  Okay.  I'll hear from Mr. Nash.

21           Is Ms. Peltzer's mom, Celeste Peltzer, on the line?

22           MR. NASH:  Judge, she is not.  Judge, she has three

23  small children, and it's impossible for her to deal with what's

24  going on and take care of them.  I just got off the phone with

25  her.

1          Judge, if I could, on the pretrial services report, if

2    you look at page 6 --

3          THE COURT:  Okay.  In the addendum or in the original?

4          MR. NASH:  You know what?  I don't know which is

5    which, and I'm not sure which one I'm talking about.  I don't

6    know that I --

7          THE COURT:  Page 6, page 6 of the addendum has the

8    risks of non-appearance and assessment of danger.  Page 6 of

9    the other one has a Will County case from 2013.

10          MR. NASH:  The Will County case.

11          THE COURT:  Okay.

12          MR. NASH:  If you look down, it says it's on 3/25/14.

13    This defendant was incarcerated in the state of Indiana, no

14    bond, warrant issued.  So a violation of the bond for her

15    failure to appear when she's in jail in Indiana, that shouldn't

16    be, and it shouldn't be a mark against her.  It wasn't her

17    fault she wasn't there.  She just failed to appear because

18    she's incarcerated in Indiana.

19          When I look at this record, it seems to me she's

20    always going to court.  She's got several cases, and I talked

21    to the -- her mother talked to the prosecutor in the case

22    that's up tomorrow in Indiana, and that prosecutor said if she

23    doesn't show up they're going to continue it till a week from

24    Friday, but if she doesn't show up a week from tomorrow in the

25    Indiana case they're going to forfeit the bond and have a

1    warrant issued even if she's in the custody of the federal

2    court, which indicates to me that this claim that she never

3    shows up is not accurate.

4         Then there's a charge on the next day -- on the next

5    page, and it says "theft, receiving stolen property, outcome

6    unknown."

7         In Key West, the Key West case, she gets 12 months

8    probation on October -- on January 1st, 2020, but that's

9    basically a traffic charge, Judge, not -- I mean, there was

10   damage to property but nothing else.

11        She lives in the south suburbs in Lansing, Illinois,

12   with her mother, her father, her son, and her brother's two

13   children, and she would be welcomed there.  She has a detainer

14   on her because of a case in Will County, but Mrs. Celeste

15   Peltzer, her mother, went to Will County yesterday to post that

16   bond.  She had the cash, the thousand dollars to post bond, and

17   they won't accept the bond without her being present.

18        So you have these small charges, but she appears.

19   She's got a place where she can stay.  She's got a family that

20   cares for her.  She's got a son, an eight-year-old son there

21   who is just learning to get acquainted with his mother after

22   her release from jail.  There's no chance she's not going to

23   appear here.  Even the guidelines say the sentence is, I think,

24   37 to 40-something months, so it's not a long prison term.

25        Then as far as the offense itself, the prosecutor

1    mentioned that the officers saw somebody on the landing of a

2    building who said that the person who did it is in a red car.

3    Well, I have the police report that the Government gave me, and

4    there's no mention of that in there.  They say that they saw

5    somebody in an entryway.  They went past and came back, and the

6    person wasn't there.  They went up to a car that was on the

7    street, and she was in there.  That's how they arrested her.

8    It doesn't say anything about anybody directing them to the

9    car.

10          Ms. Peltzer has also told me that she's been -- that

11    she has cooperated with local authorities who are investigating

12    the crime of postal theft with a key to post office boxes.

13    Mr. Berry and I tried to track that down beforehand, but we

14    were not able to.

15          So I think that she's a good risk that she'll appear.

16    Her mother will be her custodian and is willing to do that.  So

17    we're better off with her at home under electronic monitoring,

18    and she'll be in court when she's supposed to be and anyplace

19    else she's supposed to be.

20          THE COURT:  I have some questions here.  So first,

21    Mr. Berry, in terms of the nature of the crime, I didn't follow

22    everything you were saying.  I was writing it down.  You were

23    telling me in the early morning hours of May 31 the protests

24    devolved into civil unrest at 16th and Michigan.  Then you said

25    there's a person in the doorway.  Then there's Ms. Peltzer in

1    the car.

2              Could you give me the description that you were saying

3    one more time?  I don't understand how the person in the

4    doorway relates to Ms. Peltzer.  I do know that you say she was

5    arrested as she was in a car with a firearm.  So that's in

6    proximity to a firearm, but what was the business about being

7    in the doorway?

8              MR. BERRY:  Yes, Your Honor.  According to the

9    officers, as they were riding down the street observing what

10   was going on, they saw Ms. Peltzer in the doorway of an area

11   kind of -- from what they said, they believed her to be peering

12   out, kind of looking out of the doorway.  They turned back

13   around to investigate, made a U-turn, and I left this part out

14   so I apologize.  They actually went past the door, saw that

15   there was broken glass in the doorway, and then they went to go

16   try to find Ms. Peltzer to investigate further.  As they were

17   looking for Ms. Peltzer, that's when they were told by the

18   civilian that the person in the red car had a gun.

19             THE COURT:  So when they went to the red car,

20   Ms. Peltzer was in the red car.  Is that what you're telling

21   me?

22             MR. BERRY:  That's correct, Your Honor.

23             THE COURT:  And what she's being charged with here has

24   nothing to do with broken glass.  It's being a felon in

25   possession of a firearm which they found on her in the car.

1     MR. BERRY:  That's correct.  So with that, there was a

2  charge in the state for theft of property.  They did recover

3  what they believed to be some jewelry that they believed to be

4  stolen.  There's no federal charge for that, so I did not

5  mention that.  I am now, but we didn't charge that.  We don't

6  have a charge for that.

7     THE COURT:  And, Mr. Nash, Ms. Peltzer has an

8  eight-year-old son who's right now living at home with her

9  parents, correct?

10     MR. NASH:  Yes.

11     THE COURT:  And you said that her mom has other young

12  children there.  How many young children?

13     MR. NASH:  Three all together.  I don't know the ages

14  of the other two, but listening to them in the background I'm

15  guessing they're younger than eight years old.

16     THE COURT:  And these are Celeste Peltzer's kids or

17  people who she's watching kids for?

18     MR. NASH:  No, it's Celeste Peltzer's children.

19     Am I correct with that, Ms. Peltzer?

20     THE DEFENDANT:  They are four and two.

21     MR. NASH:  Yeah, that sounds about right.  I've got a

22  three-year-old and a one-year-old in my house, and I know how

23  they sound.

24     THE DEFENDANT:  Yeah.  It's my son, and then they're

25  four and two.

1        THE COURT:  And those are your mom's other kids or
2  kids of someone else?
3        THE DEFENDANT:  No, those are my mom's --
4        THE COURT:  That's your brother's kids?
5        THE DEFENDANT:  Yeah.
6        THE COURT:  And your brother lives there, too, right?
7        THE DEFENDANT:  He was on and off.  He was going
8  through a divorce, so he's there back and forth.
9        THE COURT:  So your mom is responsible for the
10  four-year-old and two-year-old most of the time.
11        THE DEFENDANT:  90 or like 95 percent of the time,
12  yes.
13        THE COURT:  All right.  I'm looking and I'm trying to
14  make my way through the criminal history here.  So, Mr. Berry,
15  Ms. Peltzer was incarcerated in Indiana or in IDOC?
16        MR. BERRY:  It looks like she was incarcerated in
17  Indiana, Your Honor.  No, actually prior to --
18        THE COURT:  She was in IDOC for five years, or she was
19  sentenced to that, right?
20        MR. BERRY:  She was in both.  She was incarcerated in
21  Indiana.  In Indiana, she received a sentence of probation for
22  that theft, and then she was violated on that and incarcerated
23  in Indiana while the Illinois Will County robbery case was
24  going on.  That's the bond forfeiture that Mr. Nash was
25  speaking about.  After her incarceration in Indiana, she then

1    came back to Illinois, pled guilty to the aggravated robbery,

2    and received five years and had been since that time in the

3    Illinois Department of Corrections.

4            THE COURT:  And when does she -- pretrial services

5    doesn't indicate, Mr. Schroeder, when she's released from IDOC.

6            MR. SCHROEDER:  It does not, Your Honor.

7            THE COURT:  Do you know when she was released?

8            MR. NASH:  Can I cut to the chase, Judge?

9            THE COURT:  Well, you can cut to whatever chase you

10   want, but I have a question.  I want to know how much before

11   she was picked up in Key West on October 27th, 2018, she was

12   released from IDOC on her sentence on 10/31/2014.

13           If Ms. Peltzer knows, you can tell me.

14           THE DEFENDANT:  Okay.  I was released May 1st of 2018,

15   my IDOC.  It's for a reckless driving ticket in Key West.

16   That's what I got probation for.  It was a speeding ticket.  I

17   was going too fast, and they gave me probation for it.

18           MR. BERRY:  Your Honor --

19           THE COURT:  But IDOC is for armed robbery, right?

20           THE DEFENDANT:  Yes, it was.

21           MR. BERRY:  Your Honor, I have a movement --

22           MR. NASH:  I would say, Judge, according to the

23   pretrial services report at page 4, it says no firearm, armed

24   robbery, dash, no firearm.

25           THE DEFENDANT:  Yeah, it's --

```
 1           THE COURT:  Oh, no firearm, I see.  I see.
 2           MR. BERRY:  Your Honor, this is AUSA Albert Berry.  I
 3    had gotten an email from the Illinois Department of
 4    Corrections.  According to their movement sheet, it looks like
 5    she was paroled on May 11th of 2018 and discharged from parole
 6    on May 12th of 2020.  So she was just discharged from parole
 7    before she picked up this charge, about two weeks off on
 8    parole.
 9           THE COURT:  And while she's on parole, she picks up a
10    reckless driving in Key West, a resisting law enforcement and
11    other things in Indiana, a Lake County possession of marijuana,
12    then an identity theft in Will County, and then this charge on
13    May 31st, right?
14           MR. BERRY:  That's correct, Your Honor.
15           MR. NASH:  I don't see the identity theft case.
16           THE COURT:  That's in the supplement.  That's in the
17    addendum that we received today.
18           MR. NASH:  I haven't seen that.
19           THE COURT:  It's on page 5 of the addendum.
20           MR. NASH:  I don't have that.
21           THE COURT:  Well, it's on the docket.  It's Will
22    County Superior Court case number 2020 --
23        (Discussion off the record.)
24           THE DEFENDANT:  Excuse me, Your Honor.  Does it matter
25    that when I had warrants I voluntarily turned myself in when I
```

1    found out I had them and posted my bond?

2            MR. NASH:  It does say that on the report.

3            THE DEFENDANT:  Okay.

4            MR. NASH:  But I haven't seen the supplemental report.

5    It may be on the docket sheet, but if you can get --

6            MR. SCHROEDER:  Mr. Nash, this is pretrial.

7            MR. NASH:  Yes?

8            MR. SCHROEDER:  On the 8th, I emailed you the

9    supplemental report along with Mr. Berry.

10           MR. NASH:  Oh, maybe I do have it.

11           THE COURT:  Check your email.

12           Ms. Peltzer, when you're saying that when you found

13   out you had warrants you turned yourself in, I actually am not

14   sure I see that on the docket sheet.

15           Mr. Schroeder, can you tell me -- I mean on the

16   pretrial, where is that on the pretrial?

17           MR. SCHROEDER:  I'll have to look for it, Your Honor.

18   I don't know off the top of my head.  Give me a second.

19           THE COURT:  I actually don't see it.

20           Ms. Peltzer, when do you think you turned yourself in?

21   When do you say you turned yourself in?

22           THE DEFENDANT:  It was right after I caught the

23   fleeing case in Indiana.  The next week when Indiana told me

24   that I had warrants in DuPage for retail theft, my mom sent me

25   to the police station, and then I missed my -- I had a speeding

1    ticket.  I went to the police department and turned myself in

2    and posted my bond.  It was like a 30-minute process, but I

3    voluntarily went to the police station and posted 7500 to get

4    out.  It was right after Indiana because Indiana told me I had

5    warrants in DuPage for the retail theft.  Then the next week,

6    my parents got the bond money together.  But they weren't

7    extraditable, which is why they didn't make me go from state to

8    state.  I went to the police department, the Oak Brook Police

9    Department, and voluntarily turned myself in, and I was there

10   for 30 minutes and let back out.

11           THE COURT:  Well, what the docket sheet says -- what

12   the pretrial services report says as of yesterday for the Will

13   County identity theft for 2,000 to $10,000, it says:

14           "Defendant has not appeared in this matter, active

15   warrant."

16           THE DEFENDANT:  I'm sorry, Your Honor.  It was the

17   DuPage case, not Will County.

18           THE COURT:  Is DuPage Oak Brook?

19           THE DEFENDANT:  Where we posted?  Yeah, it's Oak

20   Brook.

21           THE COURT:  Okay.  Okay.

22           MR. NASH:  And Ms. Peltzer's mother went yesterday to

23   post a bond for that.  The Will County one, they wouldn't

24   accept it.

25           (Brief pause.)

1          THE COURT:  And you're not -- the pretrial services

2   report says you currently do not have a job and you've been

3   unemployed since November of 2018.

4          THE DEFENDANT:  Yeah.  I do hair in my house, but it's

5   not like a regular job.  So I just do people's hair here and

6   there, like coloring and stuff like that.  But it's not like a

7   real job at a place, so no.  I mean, I can get one.

8          THE COURT:  So it looks like since being released from

9   IDOC in May of '18 you have in addition to this case -- well,

10  including this case, you have one, two, three, four, five cases

11  pending either in Indiana or in Illinois, including here in

12  federal court, and you have -- while you're on probation in

13  Florida for the reckless driving, right?

14         THE DEFENDANT:  Yes, Your Honor, but I go to all my

15  court dates.

16         THE COURT:  Yes, I know.  You may go to all your court

17  dates, I mean, but you have -- and you're charged.  You're not

18  convicted of these other five cases, but it looks like a

19  tremendous amount.  I mean, it's like a one-woman crime spree

20  here.  I mean, you're charged in a number of different cases,

21  some felonies, some misdemeanors, which is tremendously at the

22  very least erratic conduct.  I don't know what is going on in

23  your life.  I'm glad you're living with your parents.  I'm glad

24  you've living with your son.

25             Pretrial services recommends against any release here.

1          THE DEFENDANT:  Your Honor --

2          THE COURT:  Let me finish here.  I think I would

3    consider home incarceration in this case, which I think would

4    be beneficial to you, frankly, to keep you off the streets in

5    different states while these cases resolve.  In order to do

6    that, I would have to talk to your mom to see whether or not --

7    I mean, I think she indicated that she was willing to have you

8    go back and live there, obviously.

9          I don't know if it was that they talked about location

10   monitoring or not, but I don't know why it is safe to the

11   community or really why I'm assured that you will continue to

12   appear here.  Although I get that you're appearing in all these

13   cases, but I'm not sure why you're picking up all these cases.

14         I'm not interested right now in engaging in a dialogue

15   because a lot of times the lawyer doesn't necessarily want the

16   client to engage in a dialogue like this.  I would need to talk

17   to your mother in any event.  I can't tell here whether your

18   mom -- she works, it looks like, and so she's out of the house

19   a great deal as well.  I'm not sure who's in the house when

20   she's out.  She works nights, I guess, so maybe your dad.

21         THE DEFENDANT:  My father.

22         THE COURT:  What?

23         THE DEFENDANT:  My father is there.

24         THE COURT:  Okay.

25         THE DEFENDANT:  My mother works nights, and my father

1  works days.  So it's the opposite.  I really got in all this

2  trouble because I got involved with a girl that I came from DOC

3  with, but she's currently incarcerated.  So that's what my

4  downfall was.

5          MR. NASH:  We could get her on the phone, Judge.

6          THE COURT:  Well, I have a hearing at 4:00 that

7  they're calling in for.  I guess what I would do, rather than

8  entering a ruling now, is continue the hearing to a time where

9  I can get her.  I don't know if there's a time I can get both

10  Mr. and Mrs. Peltzer on the phone, but I'm --

11          THE DEFENDANT:  They're there now.  My dad gets home

12  from work at 2:30.

13          THE COURT:  And when does --

14          THE DEFENDANT:  My mom leaves for work at 6:00 p.m. or

15  around 6:00.

16          MR. NASH:  I have no objection to continuing it,

17  Judge, to enable you to do that.  I think that's most

18  reasonable.

19          THE COURT:  I have -- tomorrow I have a hearing at

20  1:30.  I could do this.  So he gets home at 2:30.  I could do

21  it at 3:00 p.m. tomorrow if the lawyers and pretrial are

22  available.

23          MR. BERRY:  That's fine with the Government, Your

24  Honor.

25          MR. SCHROEDER:  Pretrial will be able to be here, Your

1    Honor.

2              MR. NASH:  That's fine with me.

3              THE COURT:  I'm going to -- for good cause on my own

4    motion, I'm going to continue this until tomorrow at 3:00 p.m.

5    We can get Ms. Peltzer back on with this kind of notice, right?

6              THE CLERK:  Yeah, I believe so.

7              THE COURT:  Brenda?

8              THE DEFENDANT:  Yeah, I'll do it right now.

9              THE COURT:  Okay.  I really want to explore it with

10   Ms. Peltzer's parents.  I need to hear from them because I

11   think I need responsible people in her life right now.

12             I hear that you're saying you were involved with

13   somebody who you met in the Illinois Department of Corrections

14   and that now she's back in but, you know, you're --

15             THE DEFENDANT:  She's actually the one I caught my

16   DuPage case with.

17             THE COURT:  Okay.  But you're 28 years old.  You're an

18   adult, and you have a mind of your own.

19             THE DEFENDANT:  I take responsibility.

20             THE COURT:  Yes, you have a mind of your own, too.  I

21   mean, I recognize that at this time it's dangerous to be

22   incarcerated pretrial or post-trial with COVID-19, so I really

23   take that all into consideration in making these decisions.

24   But I need --

25             THE DEFENDANT:  Your Honor --

1    THE COURT:  I am not prepared with this history to

2    release you and say go out and just do whatever you want to do.

3    I would think about releasing you on some strict conditions

4    which would include home incarceration, but I would want to

5    know that where I'm sending you is someplace that they're okay

6    with that kind of condition under these circumstances.  So I

7    really want to explore that with your folks.  Mr. Nash can talk

8    to them beforehand.  If for some reason 3:00 p.m. tomorrow

9    doesn't work, Mr. Berry and Mr. Nash should call or email

10   Brenda, my courtroom deputy, and we'll figure something out.

11       But I need to get more information than I have now.

12   Right now I have somebody who's exhibiting a tremendous amount

13   of instability and reckless and dangerous conduct.  I get that,

14   you know, you've gone to court and you've told them where you

15   are and those are points in your favor, but I would want to see

16   where I would be releasing you to if I'm going to do that.

17       I have a recommendation from pretrial services who did

18   talk to your parents, at least your mom, saying that there are

19   no conditions that would reasonably assure that you would

20   continue to appear.  I'll make my own decision on this.  I

21   trust pretrial services.  I value their recommendations, but I

22   also want to do my own due diligence on this.  So if we can get

23   together tomorrow at 3:00 p.m. so that I can get some more

24   information, that would be my preference.

25       THE DEFENDANT:  Thank you, Your Honor.

1          THE COURT:  I'll continue the case until then, and

2    hopefully we can reconvene and make some more progress.

3          MR. BERRY:  Thank you, Your Honor.

4          THE DEFENDANT:  Thank you, Your Honor.

5          THE COURT:  Okay.

6          MR. NASH:  Thank you, Judge.

7          THE COURT:  Yes.  Bye-bye.

8       (Proceedings concluded.)

9                    C E R T I F I C A T E

10         I, Patrick J. Mullen, do hereby certify the foregoing

11   is an accurate transcript produced from an audio recording of

12   the proceedings had in the above-entitled case before the

13   Honorable JEFFREY T. GILBERT, one of the magistrate judges of

14   said court, at Chicago, Illinois, on July 9, 2020.

15

16                              */s/ Patrick J. Mullen*
                               Official Court Reporter
17                             United States District Court
                               Northern District of Illinois
18                             Eastern Division

19

20

21

22

23

24

25