1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3

     UNITED STATES OF AMERICA,          )   No. 20 CR 257
4                                       )
              vs.                       )   Chicago, Illinois
5                                       )
     AMBER L. PELTZER,                  )
6                                       )   July 10, 2020
                    Defendant.          )   3:02 p.m.
7

8              TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HON. JEFFREY T. GILBERT, MAGISTRATE JUDGE
9

10   APPEARANCES:

11   For the Government:    MR. ALBERT BERRY III
                            United States Attorney's Office,
12                          219 South Dearborn Street, Room 500,
                            Chicago, Illinois  60604
13

14   For the Defendant:    MR. MICHAEL B. NASH
                            Michael B. Nash, Attorney at Law,
15                          650 North Dearborn Street, Suite 700,
                            Chicago, Illinois  60654
16

17

18

19

20

21

22
                        PATRICK J. MULLEN
23                    Official Court Reporter
                    United States District Court
24          219 South Dearborn Street, Room 1412
                     Chicago, Illinois  60604
25                      (312) 435-5565

1          (Telephonic proceedings on the record.)

2          THE CLERK:  20 CR 257, United States of America versus

3     Amber Peltzer for a continued detention hearing.

4          THE COURT:  Okay.  Good afternoon, everybody.  Let's

5     have the appearances of counsel, first the United States, then

6     defense counsel, then pretrial services.

7          MR. BERRY:  Good afternoon, Your Honor.  Albert Berry,

8     B, as in boy, e-r-r-y, for the United States.

9          MR. NASH:  Michael Nash for Ms. Peltzer.

10          THE DEFENDANT:  Amber Peltzer.

11          MR. SCHROEDER:  Sam Schroeder for pretrial is here.

12          MR. NASH:  Also on the line, Judge, are Ms. Peltzer's

13     mother and father.

14          THE COURT:  Okay.  Nice to meet you, Mr. and

15     Mrs. Peltzer.  Thanks for being here.

16          And, Ms. Peltzer, you're on the line, right?  Did we

17     establish that?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Okay.  You're agreeing to participate in

20     this hearing by telephone in light of the COVID-19 crisis, is

21     that -- or pandemic, is that correct?

22          THE DEFENDANT:  Yes.

23          THE COURT:  Okay.  Well, I've thought about your case

24     quite a bit since we were together yesterday, and we scheduled

25     it at this time so that your folks could be on the line.

1          I have to tell you, Mr. and Mrs. Peltzer, that I'm

2    leaning strongly to detain your daughter while these charges

3    are pending here in federal court as both a danger to the

4    community and a risk of non-appearance, but you didn't have an

5    opportunity to talk to pretrial services before they wrote

6    their report, or you had an opportunity but it was not a good

7    time, I think, for Mrs. Peltzer given the kids that she was

8    watching.

9          So I would like to know from you whether there is

10   anything you can tell me that would convince me that if she

11   were released to your custody, if Ms. Peltzer was released to

12   your custody, she wouldn't continue on with what I

13   characterized yesterday and I still see essentially as a

14   one-woman alleged crime spree that she's been on since being

15   released from the Department of Corrections.

16         I mean, she's managed to pick up four -- no, five,

17   five arrests, one of which -- over three states, one of which

18   she was found guilty of in Florida, but then through Indiana

19   and Illinois as well since she was released from the Department

20   of Corrections, which is very, very concerning.

21         So I know, Mrs. Peltzer, you know, while she's been in

22   custody you've been taking care of her son as well as on and

23   off -- but she said more on than off -- your son's kids, your

24   own son's two kids because of his situation.  I know you work

25   at night and your husband works during the day, so this was a

1  time before you went to work and after he came home.

2          But whether you or he would like to speak, I'm very

3  troubled by your daughter's alleged conduct, and all this

4  conduct has occurred while she's been living with you.  So I'm

5  just reaching out to you because I want to look at every angle

6  here to see what you can tell me as to why it's a good bet to

7  release her, if you want.

8          You know, I should say, you know, let me also preface

9  that by saying you're not required to answer any of my

10 questions.  You're not parties here at all.  If you would

11 prefer not to answer my questions or there's nothing you could

12 say that you think would be something you want to say, you're

13 not required to say anything.  I want to stress that to the

14 max.  So, you know, I won't take any inference one way or the

15 other if you don't want to answer the questions because that's

16 completely up to you.

17         But I moved to this because Mr. Schroeder had said --

18 I think he had said that either he tried to call Mrs. Peltzer

19 or he had and there was a lot of commotion at home, which

20 believe me I understand.  I have two grandkids who are three

21 and four and then a two -- a two-year-old, a three-year-old,

22 and a five-year-old.  So I understand what that looks like, but

23 I wanted to hear from you if you wanted to tell me something.

24 If you don't, that's fine.

25         MR. PELTZER:  Well, no, I have something.  This is her

1    father.  My name is Karl Peltzer.  First let me say I in no

2    way, shape, or form accept or am I happy about what she has

3    done.  I never raised her to be this way.  She was raised -- I

4    sent her to private school.  She had problems when she was

5    younger.  She, I think --

6              MR. NASH:  Judge, if I could.

7              MR. PELTZER:  I haven't seen the part that you're

8    talking about.  When she's been at the house, I see that she

9    takes care of her son.  She's a loving aunt to both her niece

10   and nephew.  Apparently she was doing stuff that we didn't know

11   about.  I don't see her like you called her, a one-woman crime

12   spree.  I haven't seen that side.  I don't condone that side.

13             But as far as if you would release her to the house,

14   we've taken care of her son since she's gotten into trouble,

15   and her son is paying the biggest price out of everyone.  If

16   there's any way she can stay under home confinement while the

17   trial is going on, it would only benefit her son.

18             I would have no problem if my daughter broke one of

19   the rules that you set forth calling our police department.  I

20   mean, when she was younger and there was a problem, I had no

21   problem trying to get help or do whatever for her.  She's still

22   my daughter.  I love her.  I don't in no way, shape, or form

23   condone anything that she's done, but I don't see her as a

24   threat personally.  From what I saw of what's alleged in this

25   charge, like I said, I don't condone it, but she's been a good

1    mom and a good aunt to her niece and nephew.  She always takes

2    care of everything.  She's never been rude or ignorant or

3    threatened or done anything here to anybody in our family.

4              THE COURT:  Do you have any guns in your home?

5              MR. PELTZER:  I own a gun, but I don't have any in my

6    house now.

7              THE COURT:  So the gun that you own is not in your

8    house?

9              MR. PELTZER:  No.

10             THE COURT:  Where -- is it anywhere that she would

11   have access to it if she were released?

12             MR. PELTZER:  No.  When I did have a gun in the house,

13   I had a gun safe inside of another safe, but I have nothing

14   here.

15             THE COURT:  And what about your wife?

16             MR. PELTZER:  She doesn't even own an FOI card.  She

17   has nothing.

18             THE COURT:  But you have a FOID card.

19             MR. PELTZER:  Yes, I do.

20             THE COURT:  Mrs. Peltzer, Celeste Peltzer, do you have

21   anything that you'd like to add to that?

22             MRS. PELTZER:  Not really, I think my husband pretty

23   much covered everything.

24             THE COURT:  Okay.  Mr. Peltzer, I'm going to go

25   through the charges.  I don't know if you know about these or

1    not.  I think she was released from -- was it the Illinois
2    Department of Corrections or Indiana in May of 2018?
3             MR. SCHROEDER:  That was the Illinois Department of
4    Corrections, Your Honor, I believe.
5             THE COURT:  Okay.  Did she serve her Indiana sentence
6    in Illinois?
7             THE DEFENDANT:  No, I was in -- I went to Indiana, and
8    when I was finished with that they directly transferred me to
9    Illinois.
10            THE COURT:  Okay.  So after -- so in May of 2018, she
11   was released from IDOC.  In October of 2018, she was charged in
12   Key West, Florida, with reckless driving and property damage,
13   which she was found guilty of and sentenced to 12 months
14   probation.  Were you aware of that, Mr. Peltzer?
15            MR. PELTZER:  Yes, but that was after the fact.
16            THE COURT:  Then in January of 2020, she's charged in
17   St. John, Indiana, with felony resisting law enforcement,
18   criminal mischief, possession of marijuana, reckless driving,
19   other traffic offenses, where she's out on bond.  She allegedly
20   led police on a high-speed chase that ended in a crash.  Were
21   you aware of that?
22            MR. PELTZER:  Yes, I was.
23            THE COURT:  Then just five days later she's charged in
24   Oak Brook with burglary, which is a felony, and retail theft,
25   which is a felony, which she's --

1          THE DEFENDANT:  Your Honor, when I got arrested in

2     Indiana is when I found out about those warrants, and that's

3     when I turned myself in five days later.  I voluntarily went to

4     the station.  My mother is the one that took me.

5          THE COURT:  Well, I'm not sure that that -- oh, I see.

6     There was a warrant from 2019.  Got it.  Got it.  Okay.

7          MR. SCHROEDER:  Correct, Your Honor.  That 1/22/20

8     date is the date she was (inaudible) --

9          THE COURT:  Okay.

10         MR. SCHROEDER:  -- even though it's not reflected on

11    the docket, correct.

12         THE COURT:  Okay.  So that was back in 2019, and you

13    were aware of that, Mr. Peltzer?

14         MR. PELTZER:  Not until my wife -- well, until she had

15    to get bonded out.

16         THE COURT:  Right.  Okay.  Then in March of 2020,

17    there's a Lake County, Indiana possession of marijuana which I

18    think is still pending, right?  Are you aware of that one,

19    Mr. Peltzer?

20         MR. PELTZER:  Yeah, I guess, yes, sir.  We live right

21    on the border.  Not that it condoned it either one way or

22    another, but we live right on the border of Indiana and

23    Illinois.  So, yes, I knew she got caught in Indiana.

24         THE DEFENDANT:  Well, it was legal for recreational in

25    Illinois.

1      THE COURT:  I hear you.  Then the felony gun
2  possession, did you know she had a gun, Mr. Peltzer?
3      MR. PELTZER:  No, I did not.
4      THE COURT:  Do you think your -- well, it's a hard
5  question to ask, and if you don't want to answer it, that's
6  fine.  Do you think your daughter needs some kind of counseling
7  based upon just a very hard -- a lot of different things going
8  on in her life?
9      MR. PELTZER:  Yes, yes.
10      THE COURT:  I think at least according to the pretrial
11  services report, I think Ms. Peltzer said she doesn't think she
12  needs any counseling currently.
13      THE DEFENDANT:  No, I told them I was the victim of
14  sex trafficking.  Then he asked me if I thought I needed
15  counseling for that, and I said no, not for that.
16      THE COURT:  Well, right now the pretrial services
17  report says that you had been diagnosed with depression in 2013
18  in jail, you were prescribed medication, you took it while in
19  jail but you're not taking it now, and then it says, quote, and
20  does not believe she has any mental health issues currently.
21  You're saying what you were talking about was not needing
22  counseling for --
23      THE DEFENDANT:  No, I was in the -- when he asked me
24  about mental health issues, I was saying I didn't think I had
25  mental health issues about the counseling -- or mental health

1    issues.  Now the counseling part, I was misconstrued, because

2    the counseling part I was the victim of sex trafficking and

3    they were convicted and tried of it.  But I just stated that I

4    didn't think I had mental health issues that I need counseling

5    for.

6              THE COURT:  Yes, I'm over-reading the report there.

7    It was really counseling for mental health issues.

8              THE DEFENDANT:  Right, it --

9              THE COURT:  Yes.

10             THE DEFENDANT:  I'm sorry.  Go ahead.

11             THE COURT:  It wasn't really counseling.  It was

12   denying any mental health issues.

13             THE DEFENDANT:  Right, because I've never seen a real

14   psychiatrist outside of incarceration, and usually inside

15   incarceration they kind of just give you anything.  So that's

16   why I said I didn't think I had mental health issues.

17             THE COURT:  Are you doing any counseling now,

18   Mr. Schroeder, for pretrial services?  Given the COVID stuff

19   that's going on, is any counseling going on either like TeleMed

20   or otherwise?

21             MR. SCHROEDER:  Counseling currently is via

22   telemedicine, Your Honor.

23             THE DEFENDANT:  Your Honor, we only get out of our

24   cell every day for a ten-minute shower.  We're always locked in

25   our cells every day, and I don't even have a toilet in this

1    cell right now.  We can't do anything.  We can only use the
2    phone three times a week.
3              THE COURT:  You're at Kankakee, right?
4              THE DEFENDANT:  No, I'm at the MCC building.
5              THE COURT:  Oh, you're at MCC?
6              THE DEFENDANT:  Yes.
7              THE COURT:  Yes, you told me that yesterday.  I'm
8    sorry.
9              THE DEFENDANT:  Your Honor, I'll go to counseling or
10   do whatever the Court thinks I need to do.
11             THE COURT:  Ms. Peltzer, how could I be assured that
12   if I -- I mean, none of the release conditions you've been on
13   anyplace else say you have to be in the house 24/7.
14             I mean, I'm asking her this, Mr. Nash, and if you
15   don't want her to answer, you tell her before.
16             So pause before you answer, but I'm terribly
17   concerned.  I mean, your mom is there during the day.  You
18   don't --
19             You work in the evening and the nights, Mrs. Peltzer,
20   right?
21             MRS. PELTZER:  Yes, I do.
22             THE COURT:  And, Mr. Peltzer --
23             MR. NASH:  But the husband is there during the day,
24   Judge.
25             THE COURT:  -- you work.  Well, Mrs. Peltzer is there

 1    during the day, and Mr. Peltzer is there from 2:30 or 3:00 on,
 2    right?
 3                MR. PELTZER:  Yes, sir.
 4                THE COURT:  And, Mr. Peltzer --
 5                MR. NASH:  One of the two of them are always there,
 6    Judge, because they have three children they watch.
 7                THE COURT:  Right.  And, Mr. Peltzer, what do you do?
 8                MR. PELTZER:  I'm a chief engineer at a building.  I
 9    actually take care of everyone that's inside the building.  I
10    mean, I have a bunch of certifications.  I'm the person who
11    takes care of life safety.  I'm the person who has a Homeland
12    Security first responder thing for our building.
13                I mean, I can personally tell you that if you do
14    release her here and she broke even part of a rule, I would
15    have no problem calling our local police department.  I'm not
16    the kind of parent that sits here and denies that my child
17    isn't an angel or has or hasn't done anything.  My whole
18    philosophy is if you do something, you have to pay for it.
19    I've worked my entire life since I've been 16.  For all my
20    kids, I tried to give them the best of everything along the
21    way, and that's one of the reasons why I don't want to give up
22    on my daughter, for not only her but for her son.
23                THE COURT:  Mrs. Peltzer --
24                MR. PELTZER:  You know, they say you've got to hit
25    rock bottom before you go up.

```
 1              THE COURT:  Mrs. Peltzer --
 2              MR. PELTZER:  Somewhere along the line, something has
 3    to click.
 4              THE COURT:  I'm sorry.  I keep interrupting you
 5    because we're not in the same room.  I think you said -- what
 6    did you say about rock bottom?  She's hit rock bottom?
 7              MR. PELTZER:  I said I don't believe you could go any
 8    lower now.
 9              THE COURT:  There's no way to go but up, right?
10              MR. PELTZER:  That's right.  That's what I said.  You
11    know, I just also am a firm believer in family where you can't
12    give up on your kids.  It's too easy.  Even though she's a
13    grown adult and everything she does directly reflects on me, I
14    still can't give up on my kids.  I don't condone what they do.
15    I don't -- I would not cover for what they do.  I've never
16    spent a day in jail in my entire life.  The worst I've ever
17    done is a speeding ticket, I mean.
18              THE COURT:  Mrs. Peltzer, if she's at home with you
19    during the day helping take care of the kids or whatever and
20    she either leaves the house or is doing drugs or is doing
21    something that she shouldn't be doing on the conditions of
22    release, could you pick up the phone and call the pretrial
23    services officer and say:  I've got to report my daughter here?
24              MRS. PELTZER:  Yes, I could.
25              THE COURT:  I'm sorry.  I can't hear that.
```

1          MRS. PELTZER:  Yes, I could.  I would have no problem

2     doing that because, you know, I just think this is her rock

3     bottom and she can only go up from here.

4          THE COURT:  I want to ask Ms. Peltzer, Mr. Nash, how I

5     can be assured that if she's on home incarceration that she's

6     not going anywhere other than court appearances, medical

7     necessities, or anything like that.  Is it okay if I ask her

8     that?

9          MR. NASH:  Sure.

10          THE COURT:  Ms. Peltzer, you know, I'm hearing what

11     your parents are saying.  I want to ask you, though.  I mean, I

12     don't think you've ever been on home incarceration, correct?

13          THE DEFENDANT:  I have.  I have, Your Honor.  I did

14     eight months on it, and I didn't violate one time.

15          THE COURT:  When did you do that?

16          THE DEFENDANT:  For my 2010 felony for misuse of a

17     credit card, I was on sheriff's furlough through Cook County

18     for eight months.  I completed it successfully, and that's

19     (inaudible) in my case.  I actually had to go up to Cook County

20     and do counseling classes Monday through Thursday, and then I

21     had to go straight home and be in the house.  My father

22     actually used to take me.  I used to go with him to his work

23     Downtown and then go straight to the county.  Then he would

24     pick me up, and we would go straight home.  But I did it

25     successfully for eight months.  It was like six to eight

1    months.  It was a long time ago.  I don't remember exactly.

2         THE COURT:  Okay.  It's not in the pretrial services

3    report for the background, but thank you for that information.

4         Mr. Schroeder, you've already interviewed

5    Mrs. Peltzer.  Do you need to do any more interviewing here if

6    I decide I'm going to release her?

7         MR. SCHROEDER:  I mean, pretrial would normally run a

8    background check, but third party custodians have been

9    appointed without a pretrial interview.  It's been pretty much

10   covered during this hearing, though, Your Honor.

11        THE COURT:  Okay.  So, Mr. Berry, I started the

12   hearing by saying I'm leaning to detain Ms. Peltzer.  I've

13   talked to her parents.  I've heard a little bit more from her,

14   including the fact that she's already successfully completed a

15   time when she was on electronic monitoring.  I don't think I

16   would change my characterization, frankly, which is colorful, I

17   realize, but it's also I think indicative of the facts here.

18        I could go through the 3142(g) analysis and I will,

19   but there's more information here and I'm wondering why the

20   Government would think that home incarceration here would not

21   reasonably assure -- with responsible parents, would not

22   reasonably assure the safety of the community or her continued

23   appearance in court.

24        MR. BERRY:  Well, Your Honor, I see the unlawful use

25   of a credit card felony.  I think at that point in time she was

1   18.  If that's what she's speaking about, I do see violations
2   of probation there.
3            THE DEFENDANT:  It was --
4            MR. BERRY:  I'm not sure if that's the same.
5            THE DEFENDANT:  I'm sorry.
6            MR. BERRY:  I'm not sure if that's the violation of
7   the home incarceration that she's speaking about or if that's
8   something else, and I don't want to make -- you know, I don't
9   see to say one way or the other, but I do see that in the
10  pretrial report.
11           THE COURT:  Well, to me that --
12           MR. BERRY:  I would just say --
13           THE COURT:  Let me interrupt you.  To me, I thought
14  she was saying she was on pretrial home incarceration.  She was
15  sentenced to 24 months of probation on March 3rd, 2011.  She
16  does have a violation on June 25th, 2012, a bond forfeiture, et
17  cetera, but then the warrant was quashed.  It looks like some
18  other warrant was quashed, maybe that one, and it does say
19  probation was terminated satisfactorily.
20           So I'm reading that -- Ms. Peltzer could probably tell
21  us, but I'm reading that that is a probation violation after
22  she was sentenced, and what she was talking about was eight
23  months on home incarceration pretrial.
24           Is that right, Ms. Peltzer?
25           THE DEFENDANT:  Yes, that's correct.  They let me out.

1          MR. BERRY:  Okay.

2          THE DEFENDANT:  Instead of paying a bond, they gave me

3  home confinement with counseling, and that was prior to when I

4  took probation.

5          MR. BERRY:  Okay.  Your Honor, I would just --

6          THE COURT:  Go ahead, Mr. Berry.

7          MR. BERRY:  I'm sorry.  I would just stand on where we

8  were yesterday.  If you were to release her, I would say that

9  Cook County's home incarceration is entirely different than the

10  federal court's home incarceration.  I've had individuals on

11  home incarceration before, and simply going out to take the

12  garbage out can activate the system, things of that nature.  So

13  as long as she -- if you were to release, as long as she

14  understands those conditions and that it's supervised

15  differently than Cook County is and is a lot more stringent, I

16  would just ask that you give her those warnings.

17          THE DEFENDANT:  I understand.

18          THE COURT:  Oh, I always do that.  You mean the

19  federal pretrial supervision is much stricter than Cook County.

20          MR. BERRY:  That's correct, Your Honor.

21          THE COURT:  All right.  Let me tell you where I am

22  here, and I'll make a record on this in case there's any appeal

23  from either side here.  Ms. Peltzer, this is a preliminary

24  hearing in your gun case.  It has nothing to do with your other

25  cases, and it's a hearing that's mandated by Congress under the

1    Bail Reform Act.  When we started this hearing, you were

2    presumed innocent, not guilty of the charges that you're facing

3    here, and when we conclude you're presumed or not guilty of

4    those charges as well.  Nothing I'm going to say should be

5    interpreted as bearing on guilt or innocence at all.  This is

6    simply a decision as to what your status should be while these

7    charges are pending.

8          What Congress has said is that there's a presumption

9    of release.  That means that, you know, at the beginning of a

10   case there's a presumption the person should be released unless

11   the person presents a danger to the community by clear and

12   convincing evidence or there's a risk, a reasonable risk of

13   non-appearance in court to continue the case, to continue to

14   appear in the case.

15         If those things exist, though, a court still can

16   release somebody if the judge finds that there are conditions

17   that reasonably would assure the safety of the community and

18   that you would continue to appear in court.  So the analysis

19   that I'm supposed to look at are four factors:  the nature and

20   circumstances of the offense that you're charged with, the

21   weight of the evidence in the case, your own personal

22   characteristics, and any danger to the community that you pose

23   by being in the community.

24         The nature and circumstances of the offense, which is

25   a possession of a firearm by a convicted felon, it's a very

serious offense.  I mean, you know, you are a five-time
convicted felon.  I'm sure one of those times, maybe all of
those, you were told that you couldn't possess a firearm.  That
doesn't depend on which state you are in.  That's federal law.
You can't possess a firearm, and at least you're charged here
with possessing a firearm in the car that you were in.

         The allegations in the case, you know, the weight of
the evidence at least at this point is strong only because --
well, I shouldn't say "only because," but it usually is in a
case because the only person who's been able to put forth
evidence so far is the United States, and you haven't been
required to.

         But the evidence against you is that police officers
looked in your car and saw a firearm on the passenger's seat
and saw you reaching for it.  You know, that doesn't say you're
guilty of that offense, but that's a serious charge and there's
serious evidence there.

         Your personal characteristics are the most important,
but let me first go to danger to the community.  In terms of
danger to the community, your record shows by clear and
convincing evidence a danger to the community.  Just in the
last couple of years, you led police on a high-speed car chase.
You were charged with reckless driving, retail theft, burglary,
and possession of a firearm across multiple jurisdictions.  I
understand you live close to Indiana, but you're still hitting

1    up many jurisdictions as a five-time convicted felon, and

2    that's just within the last two years.  Your criminal history

3    going back to when you were a juvenile is equally robust, and

4    that's where you picked up your other five felonies.

5         So I do think the Government has shown by clear and

6    convincing evidence you're a danger to the community.  Your

7    conduct has been reckless, dangerous, erratic, and it has

8    threatened the safety of property and people for many years and

9    has gone unchecked.

10        Your personal characteristics is what matters most,

11   and what I've just, you know, what I've just summarized is your

12   personal characteristics, at least within the last two years

13   and going back awhile.  I mean, you've picked up five criminal

14   cases, both felonies and misdemeanors, just in the last two

15   years.  I mean, that's pretty impressive in a negative way.

16        You engaged in that conduct while living with your

17   parents at least for the last two years and frankly probably --

18   I mean, I don't know.  I don't know if you were living with

19   them before that or not.  But in the last two years you've been

20   living with them, though all this conduct is outside of the

21   house and not in the house.

22        So I think the Government has shown a danger to the

23   community by clear and convincing evidence and a risk of

24   non-appearance because of the erratic behavior.  You also have

25   a warrant outstanding for you in the Oak Brook --

1          MR. SCHROEDER:  Will County, Your Honor.

2          THE COURT:  In Will County, but hopefully that can be

3     dealt with.  So I'm at the crossroads here, right?  Now I have

4     to determine whether there are conditions that I can impose

5     that would mitigate that danger and mitigate the risk that you

6     wouldn't continue to appear.  You have some history, as you

7     said, with electronic monitoring, and there's no evidence here

8     to indicate that you violated those conditions.  You say you

9     did not violate them, and I take that as true.

10          I do think you could benefit from some counseling

11    here, frankly.  I don't know what's going on in your life, but

12    this behavior is not the behavior of somebody who is -- I don't

13    know -- on the straight and narrow.  There's something going on

14    here that I don't know.  I know for sure you're not going to

15    get that counseling at the MCC or in any county jail that you

16    might get transferred to.

17          So the question is:  Does releasing you to the custody

18    of your parents mitigate these dangers?  Even though you've

19    been living with them this whole time, obviously they haven't

20    been able to control you.  The additional control here would be

21    that you'd be on an ankle bracelet.  So if you left, as

22    Mr. Berry said, even to take out the garbage, pretrial services

23    would be notified, and they could send a marshal out and bring

24    you back here to be in a cell that doesn't have a toilet, as

25    you said, or a sink.

1    I'm wondering.  You know, I've heard from Mr. Peltzer,
2    and your father is an impressive guy.  Your mom hasn't said
3    much, but what she said is also impressive.  So these are very
4    fine, upstanding people who've got a tremendous amount of
5    responsibilities, including your kid and your brother's kids,
6    and they're willing to stand up for you.  Your mom told
7    pretrial services that she was willing to sign as third party
8    custodian.
9    I assume you are also, Mr. Peltzer?
10    MR. PELTZER:  I'm not familiar with what you said.
11    I'm sorry.
12    THE COURT:  You'd be willing to be --
13    MR. PELTZER:  What was it?
14    THE COURT:  You'd be willing to be appointed with your
15    wife as a co-third party custodian here, which is really the
16    eyes and ears of the court, to inform the court through
17    pretrial services if your daughter is not following conditions
18    which I would go over if I were to release her and to help her
19    comply with those conditions.  You're willing to do that?
20    MR. PELTZER:  Yes, sir.  I'm willing to do whatever
21    you need me to do to get her not only out of the conditions
22    she's in right now, but also get her the help that she needs in
23    my opinion.
24    THE COURT:  Well, the one thing that we haven't talked
25    about is a bond.  In federal court, unlike state court, often

1  people don't have to post a bond, but they sign an appearance

2  bond that the Government can go after if the person doesn't

3  comply with their conditions of release, doesn't show up in

4  court, doesn't appear to serve a sentence if she's sentenced,

5  and I'm not assuming that that would happen here.

6           I would propose you and your wife and Ms. Peltzer,

7  your daughter, sign a $50,000 appearance bond which is designed

8  to be further skin in the game for you to help your daughter

9  stay on the straight and narrow and for your daughter to stay

10 on the straight and narrow because she would know if she

11 violated these conditions of release that she's putting her

12 parents in financial jeopardy.

13          You two might want to -- you might need to talk about

14 this by yourselves without responding right now.  We could

15 actually put you in a -- well, you could mute your phone where

16 you are, or I could put you in a private room where you could

17 talk to your daughter about this.  But I think I need some type

18 of a bond here, or I would like some type of bond here, I

19 should say.

20          The home incarceration, which is what I would do,

21 which is 24/7 in the house except for approved

22 outside-the-house things, that's designed to mitigate danger to

23 the community so you know that the person -- a bond is intended

24 to assure that she continues to appear here and not run

25 someplace else.  But also, just to be clear, you would be

1    agreeing that if she violated the terms of release, then the

2    Government could come after all of you for that amount of

3    money.

4         So do you want to talk to your wife about that?  Do

5    you want to talk to your daughter?  Do you want me to put

6    you in a -- we can put you in a virtual room where the three of

7    you can talk, or you guys could talk offline if you mute

8    yourselves and then get back on.

9         MR. PELTZER:  I'm going to say I'm willing or we're

10   willing to do it.  I've never had a problem with my daughter

11   personally back and forth in not taking her at her word.  I

12   can't -- I don't know what she did out of the house, but I'm

13   assuming that she wouldn't want to wreck her life.  So I would

14   be willing to sign that.

15        THE COURT:  Well, do you want to talk to your partner

16   there?

17        MR. PELTZER:  So I'm --

18        THE COURT:  Do you want to talk to your partner there

19   before you commit to that?

20        THE DEFENDANT:  Are you talking about me, Your Honor?

21        THE COURT:  No, I'm talking about Mrs. Peltzer.

22        MR. PELTZER:  Do you agree with your husband,

23   Mrs. Peltzer?

24        MRS. PELTZER:  Yes, I agree with my husband.

25        THE COURT:  Okay.

1      MR. BERRY:  Then, Your Honor, just in case there's

2  any -- you know, just so there's clarification, I know

3  sometimes there's a thought that a bond is 10 percent of, you

4  know, the total amount.  But just so everybody is clear, this

5  bond that you're speaking about, the $50,000 unsecured

6  appearance bond, it would be the whole amount, not just 10

7  percent of it.

8      THE COURT:  Correct.  Yes, you don't have to post any

9  money today, but if she violates the conditions, the United

10 States can and they often do try and go after that amount of

11 the bond as a penalty for the non-compliance.  You understand

12 that, right?

13     MR. PELTZER:  Yes.

14     MRS. PELTZER:  Yes.

15     MR. PELTZER:  Yes, sir.

16     THE COURT:  And, Ms. Peltzer, are you willing to sign

17 that bond, too?

18     THE DEFENDANT:  Yes, Your Honor.

19     THE COURT:  And you know that if you violate the

20 conditions I put you on that you're putting your parents at

21 tremendous risk.  Do you understand?

22     THE DEFENDANT:  Yes, I do, Your Honor.

23     THE COURT:  So I could be comfortable that you

24 wouldn't do that, is that right?

25     THE DEFENDANT:  No, I wouldn't.  My parents honestly

1    through my incarceration and mess-ups in my life have been the
2    only ones in my corner, so no.
3            THE COURT:  I didn't hear what you said.
4            THE DEFENDANT:  I said I wouldn't because through all
5    my incarcerations and my mess-ups in life, my parents have been
6    the only ones in my corner.  So, no, I wouldn't put them in
7    that position.
8            THE COURT:  Well, just to be clear, you could be
9    responsible for that, too.  In other words, the United States
10   could choose who they're going after here in trying to collect
11   the total amount from.  So you're on the hook for those
12   dollars, too.  It's not just your parents.
13           THE DEFENDANT:  No, I understand that, but I wouldn't
14   put them in that position.
15           THE COURT:  Yes, I hear you.  Okay.
16           Well, I'll tell you, Mr. Berry, you know, I did walk
17   out here thinking this is somebody who I didn't know that there
18   were conditions that I could impose that would assure me here,
19   but in talking to Mr. Peltzer and Mrs. Peltzer and hearing a
20   little bit more from Amber Peltzer, I think in a case where
21   there is no presumption of detention, with home incarceration,
22   you know, it eliminates the opportunity for Ms. Peltzer to be
23   out there doing anything close to what she's at least alleged
24   to have been doing in the past years.
25           I would mandate some mental health counseling which I

1    think you could benefit from, and pretrial services would

2    arrange for you to have that.  If you had a practitioner you

3    wanted to see that's different than who pretrial services

4    recommends, I wouldn't be opposed to that, but I do think you

5    could use some counseling here.

6            You're under a tremendous stressful situation.  You've

7    got -- what have you got, five cases pending in different

8    jurisdictions?  No, four cases pending plus probation someplace

9    else.  I mean, you've got to start someplace to repair your

10   life.  You're young enough to do that.  You've got a son who

11   needs you out of jail and needs you to be his responsible

12   parent.  You know, that should be enough to push this, push you

13   toward that, but if it's not, there are other things, you know,

14   that could help you toward that.

15           I know your parents are in your corner to do it, too,

16   but I'm comfortable if I release you on these terms now that

17   you understand the consequences of your violating them and they

18   would assure me that you would respond to this case here.  You

19   know, you've got the other cases you've got to respond to, too,

20   so I would say as a condition that you continue to comply with

21   your requirements to appear in those cases as well.

22           So, Mr. Berry, do you want to try and talk me out of

23   this?

24           MR. BERRY:  No, Your Honor.  I understand your

25   position.  I understand the conditions that you are imposing.

1    I can't speak for what the other jurisdictions will do as far

2    as the outstanding warrants that she has.  I have not spoken to

3    those individuals, but that's still out there.  But I

4    understand your decision, Your Honor, and I respect it.

5            THE COURT:  Okay.  Thank you.

6            MR. PELTZER:  Your Honor --

7            THE COURT:  Yes?

8            MR. PELTZER:  -- this is Amber's dad again.  We tried

9    to post her bond for that one bond that she had or that one

10   warrant she had out twice, and they wouldn't let us do it

11   without her personally walking in.  So, I mean, it's not like

12   she wasn't going to show up for that, and we tried to post a

13   bond.

14           THE COURT:  I figured that.  I figured that.  I

15   figured that, and one of requirements that I'll have is to

16   comply with her other, you know, cases.  So at the appropriate

17   time, you can go over there with her and you can post bond, and

18   then she goes back to the house.  I would think that the

19   conditions I'm imposing are much more strict than any of these

20   county courts would impose, so I'm not afraid of them not

21   releasing her, particularly if you post bond.

22           MR. PELTZER:  Thank you, Your Honor.

23           THE COURT:  Mr. Berry, what I would like, the way I

24   would like to do this and the way I've been doing this is if

25   you call the form up on your computer, I will go through with

29

1    you and with Ms. Peltzer and with her parents the conditions of

2    release.  Then what I will do is this.  You'll send those to

3    the courtroom deputy here, I'll sign them, and then we'll send

4    them to the marshals who will get them to the MCC for

5    Ms. Peltzer to sign.  Then we'll also -- she then will

6    hopefully be released with a copy of this.  We can also send

7    the conditions directly to an email address that they would

8    provide, and they could sign as third party custodians.  I

9    think I'd rather do that.  Then everybody would then get the

10   documents back to me through my courtroom deputy after they're

11   all signed, and we'll put them on the docket.

12          I mean, Mr. and Mrs. Peltzer, you could also send them

13   to Mr. Nash, and he can get them to me, too.  But they have to

14   be on the docket.  They're put under seal so nobody could see

15   them, but we need all those signed.  Okay?

16          So, Mr. Berry, if you would be so kind as to be the

17   scrivener on this, I'm going to grab the conditions of release

18   and go through them.  Is that okay?

19          MR. BERRY:  Okay.  Yes, Your Honor.

20          THE COURT:  Okay.  Hold on.

21          MR. SCHROEDER:  Your Honor, this is pretrial services.

22   Are you still there?

23          THE COURT:  Yes, yes.

24          MR. SCHROEDER:  Due to COVID-19 and the warrant,

25   pretrial needs specific language about the defendant needing to

1    contact pretrial services when she bonds out from her warrant

2    case so that we can have a delayed installation of the location

3    monitoring equipment.

4            THE COURT:  Okay.  When we get to that part in the

5    conditions, you just say what needs to be in there and

6    Mr. Berry will put it in there.  Okay?

7            MR. SCHROEDER:  Will do.

8            MR. NASH:  Is this form available on the Court's

9    website?

10        (Brief pause.)

11            THE COURT:  Okay.  So there's going to be two

12   documents you're going to get.  One is an appearance bond, and

13   one is an order setting conditions of release.  Ms. Peltzer and

14   Mr. and Mrs. Peltzer, I'm going to go through the conditions

15   here.  So that's a three-page document you're going to get,

16   Ms. Peltzer.  The first page says "Order Setting Conditions of

17   Release."  The first condition is pretty all-encompassing.  You

18   can't violate any federal, state, or local law while you're on

19   these conditions.  Do you understand that?

20            THE DEFENDANT:  Yes, Your Honor.

21            THE COURT:  If the Government wants a DNA sample from

22   you, you're agreeing to provide it.  Do you understand that?

23            THE DEFENDANT:  Yes.

24            THE COURT:  If you change your telephone -- I mean, if

25   you change your residence or telephone number, you need to

1   inform pretrial services.  But you're not changing your
2   residence because I'm going to require you to live with your
3   parents.  But if you change your phone number, they need to be
4   able to contact you at all times.  Do you understand that?
5           THE DEFENDANT:  Yes, Your Honor.
6           THE COURT:  And when is her next court appearance,
7   Brenda?  We'll put that on the first page.
8           The second page has me placing you in custody.
9   Normally I don't do two third party custodians.  I usually only
10  do one, but you guys are going to have to double-team this
11  because of your work schedules.  So I'm going to make the third
12  party custodians both Celeste and Karl Peltzer.
13          Your address is -- I'm just looking to see if it's
14  here.  Is it 18251 Walter Street in Lansing, Illinois?
15          MS. PELTZER:  Yes, Your Honor.
16          MR. PELTZER:  Yes.
17          THE COURT:  And what's the zip?
18          MS. PELTZER:  604 --
19          MR. PELTZER:  60438.
20          THE COURT:  And we're going to need to put both your
21  phone numbers on this form.  This will be under seal on the
22  docket, but first Mr. Peltzer's phone number?
23          MR. PELTZER:  (312) 771-1065.
24          THE COURT:  And Mrs. Peltzer's?
25          MRS. PELTZER:  (708) 248-0100.

1          THE COURT:  Okay.  So we're going to check the box,

2    Mr. Berry, under 7, the one in the left-hand margin, and then

3    the following conditions, (a), submit to supervision by and

4    report for supervision to pretrial services.

5          I don't know if you have a pretrial services officer

6    now, Mr. Schroeder, or you're going to assign one.

7          MR. SCHROEDER:  It will be Specialist Alvarez's area,

8    Your Honor.

9          THE COURT:  Okay.  Say that again.  You broke up a

10   little bit.  Say that again.

11         MR. SCHROEDER:  I'm sorry.  It's Officer Alvarez's

12   location monitoring area.

13         THE COURT:  Okay.  So it's going to say to submit to

14   supervision by and report for supervision to pretrial services.

15   If you want to say in there, Mr. Berry, Officer Alvarez, that's

16   fine, or if you just want to leave it at --

17         MR. BERRY:  Okay, Your Honor.

18         THE COURT:  -- pretrial services, that's fine, too.

19         Right now, you're not allowed to work, Ms. Peltzer.

20   If the opportunity for employment comes up in the future, you

21   can talk to Mr. Nash, but we're not checking the box that says

22   to continue or actively seek employment.

23         Do you have a passport?

24         THE DEFENDANT:  No, I don't, Your Honor.

25         THE COURT:  Okay.  You can't obtain a passport.

1          So, Mr. Berry, I wouldn't check surrender passport,

2    but I would check the next one, not obtain a passport, not

3    obtain a passport or other international travel document.

4          You can't get a passport while these conditions are

5    pending.  Do you understand that?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  I don't think there's any restrictions on

8    personal associations.  I mean, I'm not allowing her to leave

9    the house at this point, so I don't need a travel restriction,

10   Mr. Berry, I don't think.

11         MR. BERRY:  I agree with that, Your Honor.

12         THE COURT:  If things change in the future --

13         MR. SCHROEDER:  Well, the --

14         THE COURT:  Go ahead.

15         MR. SCHROEDER:  Your Honor, regarding the defendant's

16   pending cases, she will probably -- likely if she's restricted

17   to the home, she will need to go to her pending cases, correct?

18         THE COURT:  Correct, yes.  It says, you know, for home

19   incarceration, looking farther down, she's restricted to

20   24-hour-a-day lockdown at the residence except for medical

21   necessities, court appearances, or other activities

22   specifically approved by the court.

23         I'm going to add in (s), that she -- maybe this is the

24   -- I'm going to add in (s), that she appear for and comply --

25   well, appear for.  I probably need some help here.  What I want

34

```
 1   to say is to continue to attend to her pending cases in other
 2   jurisdictions.  Do you have other language you would use,
 3   Mr. Schroeder?
 4           MR. SCHROEDER:  And comply with any court orders.
 5           THE COURT:  Okay.  So continue to attend to, comma,
 6   appear in or appear for, comma, and comply with any court
 7   orders entered in her other pending cases -- well, we'll go the
 8   full nine yards -- in Florida, Indiana, and Illinois.  Is that
 9   sufficient, Mr. Schroeder --
10           MR. SCHROEDER:  That's sufficient, Your Honor.
11           THE COURT:  -- to allow her to go?  Okay.  You've got
12   that (s), and you're checking (s), Mr. Berry?
13           MR. BERRY:  Yes, Your Honor.
14           THE COURT:  And you understand, Ms. Peltzer, I'm
15   allowing you to leave the house to do those things.  What
16   you're going to need to do, though, when you're talking to your
17   pretrial services officer at the beginning of every week, you
18   have to tell him there's a -- you know, you got a court
19   appearance at 2:00 p.m. in Indiana and you're going to need to
20   leave the house at X time and you'll be back in at Y time so
21   that they can adjust your electronic monitoring.  Do you
22   understand that?
23           THE DEFENDANT:  Yes, Your Honor.
24           THE COURT:  I'm going to order that you not possess a
25   firearm, destructive device, or other weapon.  Do you
```

1    understand that?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  And, Mr. Peltzer, you're saying there's no

4    firearms in your house, right?

5              MR. PELTZER:  Correct, Your Honor.

6              THE COURT:  And the firearm that's no longer in your

7    house, do you know where that is?

8              MR. PELTZER:  Yes, I do.

9              THE COURT:  Where is it?

10             MR. PELTZER:  It's at my sister's house.

11             THE COURT:  Okay.  So you can live with it being there

12   and not at your house?

13             MR. PELTZER:  Yes.  If it's a necessity to have her

14   here, yes, sir.

15             MR. SCHROEDER:  Your Honor, I believe you want

16   condition (h).  Condition (h) will be the mental health

17   counseling.

18             THE COURT:  Yes.  Okay.  Let me go back up to that.

19   If this presents a problem for you, you need to let me know

20   because, I mean, I'd prefer there be no firearms in the house,

21   considering the fact that you're living with a convicted felon

22   who has been now charged with being in possession of a firearm.

23   I know you keep it under lock and key, but your daughter seems

24   to be a pretty creative person.  So I'd prefer that there be no

25   firearms in your house.  If you can't do that, you need to let

1    me know.

2              MR. PELTZER:  No problem.

3              MR. NASH:  Your Honor, it will not be, and he

4    understands that.

5              MR. PELTZER:  Yes, it won't be in my house.

6              THE COURT:  Okay.  I am going to check (h), that you

7    get medical or psychiatric treatment at the direction of

8    pretrial services.  Do you understand that, Ms. Peltzer?

9    That's condition (h).

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  And I think what they normally do is

12   they'll have you evaluated, and then the person who evaluates

13   you will recommend next steps.  So you're agreeing to go

14   through that process, right?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  We talked about not possessing a firearm.

17   You cannot use alcohol excessively.  That's very important

18   because I want you to always be in possession of your faculties

19   and know what you're doing and know that you're on these

20   conditions.  Do you understand that?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  And you could do that?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  And, Mr. and Mrs. Peltzer, you understand

25   that, too?

37

1          MR. PELTZER:  Yes, sir.

2          MRS. PELTZER:  Yes.

3          MR. PELTZER:  Yes, Your Honor.

4          THE COURT:  So you'll help her comply with that

5    condition, right?

6          MR. PELTZER:  Yes.

7          THE COURT:  Okay.  You can't use or unlawfully possess

8    any narcotic drugs or other controlled substances that are not

9    prescribed to you.  Do you understand that, Ms. Peltzer?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  And the parents understand that, too?

12         MR. PELTZER:  Yes, Your Honor.

13         THE COURT:  What do you think about submit to testing,

14   Mr. Schroeder?  I mean, I don't think there's any history here

15   of this, so I don't know that I was going to.  Well, I guess

16   there's marijuana history, and it's illegal.

17         MR. SCHROEDER:  Correct.  So with marijuana, we would

18   because it's federally illegal.  It's pretrial's position it

19   would have to be added, but we always leave it to your

20   discretion, Your Honor.

21         THE COURT:  You would recommend it then, right?

22         MR. SCHROEDER:  Pretrial, yes, asks that it be added.

23         THE COURT:  Yes.  So here's the wrinkle, Ms. Peltzer.

24   I am going to add that you submit to testing if pretrial

25   services directs it or at its direction for substance abuse.

38

1    You're on a pending marijuana charge.  You were allegedly
2    arrested after the high-speed car chase and they smelled
3    marijuana.  So the anomaly here is that it may be legal for
4    recreational use in Illinois.  It's not legal under federal
5    law, and you're subject to federal law here in these
6    proceedings.  So you cannot use marijuana under these
7    conditions, regardless of whether it's legal in Illinois.  Do
8    you understand that?
9            THE DEFENDANT:  Yes, Your Honor.
10           THE COURT:  They will test you randomly to see if
11   you're complying with that condition, and if you're not they'll
12   let me know.  Do you understand that?
13           THE DEFENDANT:  Yes, Your Honor.
14           THE COURT:  Okay.  Then I would check (p) which is
15   location monitoring and home incarceration under there,
16   Mr. Berry, and then (q), submit to location monitoring.
17           MR. BERRY:  Yes, Your Honor.
18           THE COURT:  So you're understanding, Ms. Peltzer, you
19   are essentially on house arrest, which is probably what you
20   were on with the county except, as Mr. Berry was saying, it's a
21   little bit different here.  Your case number here is 20 CR 257.
22   That's your criminal number here.  So that means there is 256
23   people who were charged this year through July or whenever you
24   were charged.  Maybe it was May 31st, the actual date of the
25   complaint or indictment.  No, June 10th.  So there were 256

1   people before you.  I don't even know whether you want to guess

2   how many people will be charged in Cook County, Will County, or

3   other counties here.  It would be, you know, probably

4   thousands.

5          So you're under a different scrutiny here than you've

6   been under when you've been on pretrial release in any of the

7   other jurisdictions you've been in.  There are many fewer

8   people, and the pretrial services officers have many fewer

9   cases than in all those places.  So they know what you're

10  doing, and they will supervise you closely.  Do you understand

11  that?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  And they will keep me advised if there are

14  any issues that they need to keep me advised about.

15         Then I would do condition (r) as well, report as soon

16  as possible any contact with law enforcement.  You're going to

17  be in the house, but there will be times you're allowed out of

18  the house for a court appearance, potentially for counseling if

19  it's not TeleMed, and if you have any interaction with law

20  enforcement at all, an arrest, questioning, a traffic stop, you

21  are required to report that to pretrial services so they hear

22  it from you before they hear it from the police.  Do you

23  understand that?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  Any questions about any of this?

1          THE DEFENDANT:  How do I go about with -- you guys

2    said something about reporting with my warrant in this?

3          THE COURT:  I would anticipate with your state court

4    cases, if you have a court appearance in a state court case,

5    you know --

6          THE DEFENDANT:  No, but I mean on the warrant that I

7    have right now.  Like do I have to like do something special

8    with like posting for my warrant and then reporting?  I want to

9    get an understanding of how to handle that.

10         THE COURT:  Are you talking about the warrant issued

11   in Oak Brook?

12         THE DEFENDANT:  Yeah -- no, the one that's in Will

13   County, the one that my parents are going to have to pay.

14         MR. NASH:  You're going to be able to go to those

15   court hearings, and you'll be able to go for both bonds.

16         THE DEFENDANT:  Okay.

17         THE COURT:  I think Mr. Schroeder had some language he

18   wanted to put in here on that.

19         MR. SCHROEDER:  Correct.

20         THE COURT:  I mean, the long and short of it is that

21   you will be allowed to go there.

22         So should we add a condition (t) under (s)?

23         MR. SCHROEDER:  Correct, Your Honor.  It's going to be

24   a little long.  It will simply say contact pretrial services

25   within usually 24 hours after release from custody, and I have

1    a phone number here, (312) 446-8509.  Then we would also ask

2    Your Honor to include language about delayed installation due

3    to COVID-19 and the warrant and an unknown release time.

4          THE COURT:  Did you get that, Mr. Berry, for condition

5    (t)?

6          MR. BERRY:  Yes, Your Honor.

7          THE COURT:  So, Ms. Peltzer, I think what he's saying

8    is that once you know when you can appear there, you're going

9    to have to tell pretrial services.  You'll then go there.  If

10   they take you into custody and then you bond out or if they

11   don't take you into custody and they just accept your bond as a

12   transaction, either way, within 24 hours of your clearing that,

13   you need to make pretrial services -- let pretrial services

14   know that that's happened.

15         Is that right, Mr. Schroeder?

16         MR. SCHROEDER:  Correct, Your Honor.  The likely

17   scenario here is that Ms. Peltzer will go into Will County

18   custody and appear out there sometime during this weekend or

19   next week to post her bond.  After that, then she calls

20   pretrial to let them know she's out of custody and back out.

21         THE COURT:  Is there currently a detainer on her so

22   that they're going to pick her up from the MCC?

23         MR. SCHROEDER:  There's an active warrant, Your Honor.

24   So, yeah, the likely scenario is she will go into custody in

25   Will County, and that warrant is (inaudible).

1    THE COURT:  Well, I suppose -- I mean, I don't know.
2  Nobody has asked me about this, but do you want me to delay
3  your release until Monday?  Would you rather go to Will County
4  and spend the -- would you rather go to Will County tonight, or
5  would you rather go --
6    MR. SCHROEDER:  Well, Your Honor, that is something
7  that you might want to talk to the marshals about.  She might
8  not go to Will County until she's released from federal
9  custody.
10    THE COURT:  Okay.
11    THE DEFENDANT:  I would rather go tonight, Your Honor.
12  I have a court next date next week that I have to be present
13  for.
14    THE COURT:  Okay.  Why don't we sign the paperwork
15  now.  Then they'll get you out of there when they can get you
16  out of there, and then Will County will most likely pick you
17  up.  But then hopefully you'll be able to get out of Will
18  County.  When you're out of all of that, when you're out of
19  Will County, let pretrial services know.  Then they can make
20  arrangements to hook you up with their electronic monitoring.
21  Okay?
22    THE DEFENDANT:  Okay.  So my parents, would they be
23  able to post my bond here, or do they have to pick me up?  I
24  know when I was in Cook County before you guys, federal, you
25  guys picked up my case federally, they were going to let me

1    post my bond there.

2           THE COURT:  I don't know anything about it.  I don't

3    think they can.  I think that's a whole different court system,

4    a whole different jurisdiction.  I think they have to take

5    custody of you, and they have to accept the bond or whatever --

6           THE DEFENDANT:  Okay.

7           THE COURT:  -- and put you on whatever conditions they

8    want to put you on and then release you.  So I think it's a

9    whole different ballgame.

10          THE DEFENDANT:  Okay.

11          THE COURT:  Do you have the language, Mr. Berry?

12          MR. BERRY:  Yes, Your Honor.

13          THE COURT:  Okay.  You've been listening to all this,

14   Mrs. and Mrs. Peltzer?  Do you have any questions about any of

15   this?

16          MR. PELTZER:  No, Your Honor.

17          THE COURT:  You're essentially the eyes and ears of

18   the court, right?  That's what they call third party

19   custodians.  You're not a jailer, but you're supposed to be

20   helping your daughter comply with these conditions, watching

21   and helping to make sure she does, and if she's not, as you

22   both have said, you're going to pick up the phone and call

23   either law enforcement or the pretrial services officer whose

24   number you will have so that she doesn't get in any more

25   trouble.  Do you understand that?

1      MRS. PELTZER:  Yes.

2      MR. PELTZER:  Yes.

3      THE COURT:  Okay.  Then you're going to -- there's a

4  line provided for your signatures here.  There's only one line,

5  so you'll have to share that line, either go on top of each

6  other or next to each other when you get this paperwork.

7      MR. PELTZER:  Yes, sir.

8      THE COURT:  In addition, there's the appearance bond,

9  and that's going to be a two-page document you're going to get,

10  Ms. Peltzer.

11      This is a $50,000 unsecured bond, so that's what you

12  should fill in, Mr. Berry.

13      MR. BERRY:  Yes, sir.

14      THE COURT:  If you don't appear for court proceedings,

15  if you're convicted and you don't surrender to serve a

16  sentence, or if you don't comply with conditions that we just

17  went over in detail for your release, then the United States

18  can go after all of you collectively for $50,000.

19      Do you understand that, Ms. Peltzer, and you're

20  agreeing to that?

21      THE DEFENDANT:  Yes, Your Honor.

22      THE COURT:  Do you both understand and agree?  Sorry.

23  It was a compound question.

24      THE DEFENDANT:  Oh, yes, I understand and agree.

25      THE COURT:  And, Mr. and Mrs. Peltzer, you're willing

```
 1   to do this?
 2           MR. PELTZER:  Yes.
 3           MRS. PELTZER:  Yes.
 4           THE COURT:  Okay.  So I'm going to sign this at the
 5   bottom, and I'll put X's where you are supposed to sign it.
 6   You'll get these documents as soon as we get them signed by
 7   your daughter.
 8           Then you'll get them, Ms. Peltzer, as soon as I've
 9   gotten them signed.
10           Then you've got to give them to the marshal to come
11   back, right?
12           THE CLERK:  Yes, and they send them to the MCC.
13           THE COURT:  Are they waiting for it?
14           THE CLERK:  Yes, and they send it on to the MCC.
15           THE COURT:  Yes.  So they're dying because it's 4:00
16   and they want to get this done.
17           THE CLERK:  You can do it in person.
18           THE COURT:  Okay.  So, Mr. Berry, if you get it to me
19   quickly --
20           MR. BERRY:  Yes, Your Honor.
21           THE COURT:  -- or get it to Brenda, my courtroom
22   deputy, she'll print it out or I'll sign it on the screen.
23   Then we'll get it back to the marshal, Mr. Banos.  Then he'll
24   get it to the MCC, and we're on our way here.  Okay?
25           MR. BERRY:  Yes, Your Honor.
```

```
 1              THE COURT:  All right.  Anything further from the
 2    defense side of this, Mr. Nash?
 3              MR. NASH:  No, Judge.  Thank you.
 4              THE COURT:  Any of the Peltzers?
 5              THE DEFENDANT:  No.  Thank you, Your Honor.
 6              MR. PELTZER:  No, Your Honor.
 7              THE COURT:  Mr. Berry?
 8              MR. BERRY:  No, Your Honor.
 9              THE COURT:  All right.  Good luck to you, Ms. Peltzer.
10    I don't have any further proceedings in front of me in this
11    case.  The case has been assigned for trial to Judge Pacold,
12    and so you'll have the next proceedings in front of her.
13              What's the next date, Brenda?
14              THE CLERK:  The next date before Judge Pacold is July
15    28th at 10:30 a.m.
16              THE COURT:  So would you put that on the front page of
17    the order, Mr. Berry?
18              MR. BERRY:  I will.  Thank you, Your Honor.
19              THE COURT:  Okay.
20              MR. BERRY:  And you said at what time?  I'm sorry,
21    Brenda.
22              THE CLERK:  Oh, no problem.  10:30 a.m.
23              MR. NASH:  Before Judge Pacold?
24              THE COURT:  Yes.
25              THE CLERK:  Correct.
```

1          THE COURT:  What was the date again?

2          THE CLERK:  July 28th.

3          THE COURT:  Okay.  So by then you should have

4   everything straightened away.  I don't know if that's going to

5   be in person or by video or phone, but I'm sure you have a

6   lawyer in that.  Well, it's the same lawyer, right?  You've got

7   Mr. Nash in that case, right?

8          MR. NASH:  Yes, Judge.

9          THE COURT:  Okay.  So you'll let her know how she has

10  to appear.

11         MR. NASH:  Yes, Judge.

12         THE COURT:  Okay.  Everybody, be safe out there,

13  please.  I'm counting on you as a team here to have Ms. Peltzer

14  comply with these conditions, satisfy her remaining legal

15  obligations over three states and here in federal court, and

16  get your life moving in a more positive direction, Ms. Peltzer.

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  There's a -- social science research shows

19  that people who are released and not detained pretrial do

20  markedly better at the sentencing phase if they end up being

21  convicted of charges for crimes.  So you should keep that in

22  mind because being released is a huge step.

23         THE DEFENDANT:  I will.

24         THE COURT:  If you do end up getting convicted in this

25  case -- and I don't know if you will -- if you do, being

1    released puts you in a much better position at any sentencing,

2    both here and probably in any of your other state cases, too,

3    for complying with all the conditions of release.  So you

4    should keep that in mind.  So putting your money in the bank,

5    so to speak, by complying with these conditions, you're helping

6    yourself a lot.  Do you understand that?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Okay.  All right.  Good luck, and we'll

9    close the proceeding.

10             THE DEFENDANT:  Thank you, Your Honor.

11             THE COURT:  Okay.

12             MR. BERRY:  Thank you, Your Honor.

13             THE COURT:  Bye-bye.

14             MR. NASH:  Thank you.

15        (Proceedings concluded.)

16                  C E R T I F I C A T E

17        I, Patrick J. Mullen, do hereby certify the foregoing
     is an accurate transcript produced from an audio recording of
18   the proceedings had in the above-entitled case before the
     Honorable JEFFREY T. GILBERT, one of the magistrate judges of
19   said court, at Chicago, Illinois, on July 10, 2020.

20                            /s/ Patrick J. Mullen
                              Official Court Reporter
21                            United States District Court
                              Northern District of Illinois
22                            Eastern Division

23

24

25